1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4
    UNITED STATES OF AMERICA        *        19-CR-197
5                                   *
    versus                          *        Section D
6                                   *
    KHALID AHMED SATARY             *        December 12, 2022
7                                   *
    * * * * * * * * * * * * * * * * *
8

9
                NOTICE TO APPEAR/SHOW CAUSE HEARING BEFORE
10                   THE HONORABLE WENDY B. VITTER
                     UNITED STATES DISTRICT JUDGE
11

12  Appearances:

13
    For the United States        U.S. Department of Justice
14  of America:                  Criminal Fraud Section
                                 BY:  JUSTIN M. WOODARD, ESQ.
15                                    ALEXANDER POGOZELSKI, ESQ.
                                 1400 New York Avenue NW
16                               Washington, DC 20005

17
    For Khalid Ahmed Satary:     Chilivis Grubman, LLP
18                               BY:  SCOTT R. GRUBMAN, ESQ.
                                 1834 Independence Square
19                               Atlanta, Georgia 30338

20
    For Khalid Ahmed Satary:     Garland Samuel & Loeb, PC
21                               BY:  AMANDA R. CLARK-PALMER, ESQ.
                                 3151 Maple Drive
22                               Atlanta, Georgia 30062

23

24

25

1    Appearances:

2

3    For Khalid Ahmed Satary:        M. KYLE WINCHESTER, ESQ.
                                     1800 Peachtree Street NW
                                     Suite 300
4                                    Atlanta, Georgia 30327

5

     Also Participating:            Carl Lietz, Esq.
6

7    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, B-275
8                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
9

10

11

12

13   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
14

15

16

17

18

19

20

21

22

23

24

25

<u>**INDEX**</u>

                                                    <u>Page</u>

Dawn Satary

        Direct Examination By The Court          54

        Cross-Examination By Mr. Woodard         59

        Cross-Examination By Mr. Lietz           62

        Redirect Examination By The Court        66

| | |
|---|---|
| 1 | <u>**PROCEEDINGS**</u> |
| 2 | **(December 12, 2022)** |
| 3 | **THE COURT:**  Please be seated. |
| 4 | *United States of America v. Khalid Satary*, case |
| 5 | 19-197.  Let's everybody make appearances. |
| 6 | For the government, please tell me who is |
| 7 | present. |
| 8 | **MR. WOODARD:**  Yes, Your Honor.  Good afternoon. |
| 9 | Justin Woodard for the United States along with my colleague, |
| 10 | Alexander Pogozelski.  At the table, if that's acceptable to |
| 11 | the Court, is Special Agent Brian Frank with Health and Human |
| 12 | Services.  We also -- |
| 13 | **THE COURT:**  I'm sorry.  You are going too fast, |
| 14 | Mr. Woodard. |
| 15 | **MR. WOODARD:**  Yes, Your Honor. |
| 16 | **THE COURT:**  Your special agent is who? |
| 17 | **MR. WOODARD:**  His name is Brian Frank. |
| 18 | **THE COURT:**  Brian Frank. |
| 19 | **MR. WOODARD:**  Then we invited another agent, who is |
| 20 | based in Houston with the FBI.  He is, I believe, on the Webex. |
| 21 | His name is O'Neil Brown, a special agent with FBI. |
| 22 | **THE COURT:**  Agent Frank is with the FBI? |
| 23 | **MR. WOODARD:**  He is with Health and Human Services. |
| 24 | **THE COURT:**  Oh, I'm sorry. |
| 25 | Agent Brown, you're on Zoom or by audio? |

04:14

1          **SPECIAL AGENT BROWN:**  Yes, Your Honor, and also

2  video.

3          **THE COURT:**  And video.  Thank you.

4              Thank you, Mr. Woodard.

5          **MR. WOODARD:**  Yes, Your Honor.

6          **THE COURT:**  Counsel for Mr. Satary.

7          **MR. GRUBMAN:**  I'm sorry.  Your Honor, for Mr. Khalid

8  Satary, this is Scott Grubman on Zoom.  I have my co-counsel

9  Amanda Clark-Palmer as well as Kyle Winchester, all for

10  Mr. Khalid Satary.

11          **THE COURT:**  Mr. Grubman, is Mr. Satary present with

12  you?

13          **MR. GRUBMAN:**  He is not, Judge.  We have been unable

14  to get in touch with him.

15          **THE COURT:**  Melissa, would you call in the hallway

16  for Khalid Satary --

17          **THE DEPUTY CLERK:**  Yes, ma'am.

18          **THE COURT:**  -- because I'm about to declare him a

19  fugitive from justice.

20              Melissa, at my request did you just go into the

21  hallway and call the name Khalid Satary?

22          **THE DEPUTY CLERK:**  Yes, ma'am.

23          **THE COURT:**  Did anybody respond?

24          **THE DEPUTY CLERK:**  No, ma'am.

25          **THE COURT:**  Is anybody in the hallway?

04:16

1    **THE DEPUTY CLERK:**  No, ma'am.  There is no one in the
2    hallway.
3    **THE COURT:**  This past Friday, December 9, the Court
4    filed into the record a notice to appear and filed an order to
5    appear -- they are in the record at R. Doc. 338 and 339 -- for
6    a hearing today.  I ordered that Khalid Satary, the defendant
7    in this matter, appear in court.  He has not appeared in court.
8    Mr. Grubman or anybody for Mr. Satary, I would
9    like to hear further.  When is the last time you were in touch
10   with your client?
11   **MR. GRUBMAN:**  The last time we were in touch with our
12   client was Wednesday, November 30.  It looks like the last time
13   I was in touch with the client based on -- I'm looking right
14   now -- my text messages was Wednesday, November 30, and
15   Ms. Clark-Palmer was on the call too.  I'm sorry that we are in
16   different places.
17   Ms. Clark-Palmer, does that comport with your
18   memory as well on the date?
19   **MS. CLARK-PALMER:**  Yes, it does.
20   **THE COURT:**  Without breaking any privileges or
21   advising me what was communicated, it's my understanding from a
22   conversation with you that you have been trying to get in touch
23   with your client since that time and have been unable to get in
24   touch with him.  Is that correct, Mr. Grubman and
25   Ms. Clark-Palmer?

04:18

1          **MR. GRUBMAN:**  Correct.

2          **MS. CLARK-PALMER:**  (Nods head.)

3          **MR. GRUBMAN:**  Correct.

4          **THE COURT:**  Can you tell if his phone is operational?

5          **MR. GRUBMAN:**  I cannot tell exactly, although it does

6     appear as though it is not going through.

7          **THE COURT:**  I understand you have spoken to his son,

8     who I made third-party custodian, and that's Mr. Jordan Satary.

9     In your discussions with Mr. Jordan Satary, he indicated that

10    he did not know where his father was; is that correct?

11         **MR. GRUBMAN:**  Yes, Your Honor.

12         **THE COURT:**  On October 8, 2019, when this case was

13    indicted, a $500,000 secured cash bond was set by the Court.

14    It's in the record at R. Doc. 28.  Mr. Satary agreed that the

15    bond may be forfeited if he failed to appear for court

16    proceedings or failed to comply with the conditions set forth

17    in his conditions of release.

18              At that time I held a hearing in this court and

19    I allowed Mr. Jordan Satary, Mr. Khalid Satary's adult son, to

20    be named third-party custodian of his father.  Mr. Jordan

21    Satary testified under oath before me that he agreed to act as

22    his father's third-party custodian.  He specifically agreed to

23    supervise Mr. Satary, use his best effort to assure

24    Mr. Satary's presence at all court proceedings and, further, to

25    notify the Court if Mr. Satary violated any condition of

04:20

1    release or was no longer in Mr. Jordan Satary's custody.

2                I have the order setting conditions of release,

3    which is in the record at R. Doc. 30-1, signed by Mr. Jordan

4    Satary, setting forth those conditions that he agreed to as

5    third-party custodian.  In order to have Mr. Satary, the

6    defendant, released, he did provide a $500,000 cash bond, and

7    he was released from custody on October 9, 2019.

8                On November 21, 2019, the Court granted

9    Mr. Satary's motion to amend the bond conditions to allow him

10   to travel both to New Orleans and to Houston so long as he

11   notified his Atlanta pretrial services officer.  That's in the

12   record at R. Doc. 39.

13               Again, on October 1, 2021, the Court granted

14   Mr. Satary's motion again to amend his bond conditions to allow

15   him to travel throughout the lower 48 states as long as he

16   notified a probation officer.  I also clarified at that time

17   that while Jordan Satary remains third-party custodian over his

18   father, Mr. Satary, he need not live in the same household.

19               Finally, on October 1, 2021, I required

20   Mr. Satary, the defendant, to verify with a pretrial services

21   officer his compliance with his conditions and that he cannot

22   work in the health care or medical field, which was one of the

23   conditions that I imposed when I allowed him to be released

24   from custody pending trial.

25               Today is December 12, 2022.  As I just

04:22

1    indicated, Mr. Satary has been noticed to appear at this

2    hearing.  His attorneys do not know where he is, have not had

3    communication with him since November 30, and he has not

4    appeared in court.  I have already issued a warrant for his

5    arrest and that warrant remains outstanding.  Mr. Satary is now

6    a fugitive.

7                    Before me at this time, I have ordered

8    Mr. Jordan Satary to appear in court today to discuss his role

9    as third-party custodian for his father and what he knows about

10   his father's whereabouts.  Is Mr. Jordan Satary present in

11   court?

12           **MR. LIETZ:**  Good afternoon, Your Honor.  He is

13   present today.  My name is Carl Lietz.  I am from Atlanta,

14   Georgia, and I am here representing Jordan this afternoon,

15   Judge.

16           **THE COURT:**  Sir, tell me your name again.

17   Mr. Carl Lietz?

18           **MR. LIETZ:**  Yes, Your Honor.  It's Carl, with a C,

19   Lietz, L-I-E-T-Z.

20           **THE COURT:**  Thank you, Mr. Lietz.  Mr. Satary is

21   present in court today.

22           **MR. LIETZ:**  Mr. Jordan Satary is present in court

23   today.  He is also here with his mother as well.  She is

24   sitting in the courtroom.

25                    May I just add a couple of things into the

04:23

1    record, if I may, Your Honor?

2            **THE COURT:**  Yes, yes.

3            **MR. LIETZ:**  We received notice of the Court's two

4    orders on Friday.  The two orders that I'm talking about are

5    the ones that you referenced previously.  I believe you said

6    one is docketed at 338, the one that ordered the defendant to

7    show up here this afternoon.  We also received the order to

8    show cause, which I think we are going to talk about in a

9    minute.

10           As it relates to that first order, docket 338, I

11    just wanted the Court to know that since receiving that order,

12    Mr. Jordan Satary has made efforts himself to get his father to

13    appear in court today.  Those efforts included phoning him at

14    the number that he had for him -- I think the government can

15    verify that those phone calls were made -- sending a text

16    message to him, and also emailing him.

17           He has made every effort he knows to make to get

18    his father here in court today.  He is not happy that his dad

19    is not here.  He made efforts before that to actually get in

20    touch with his father, and maybe we will get into some of that

21    today, Your Honor.  The defendant in this case has put his son

22    in a very bad position.

23           I wanted to talk just maybe briefly -- I'm

24    certainly not trying to take over.  I know you've got some

25    questions, but I just wanted to at least clarify one thing that

04:25

1    the Court mentioned and perhaps just offer a little bit more

2    information, if I may, Judge.

3              **THE COURT:**  You may, Mr. Lietz.

4              **MR. LIETZ:**  Thank you.  I think that the Court's show

5    cause order and what you said today, Your Honor, set out the

6    history related to the third-party custodial situation very

7    well.  There's just a couple of things I want to point out.

8                   As I understand it, the hearing was initially

9    held in here on October 8, 2019.  It was at that time that the

10   defendant's previous lawyer volunteered to have Jordan Satary,

11   then a 25-year-old young man, serve as the third-party

12   custodian.  It was something that wasn't presented to him

13   before the hearing, something he learned about at the hearing,

14   but the Court made it very, very clear on the record what you

15   were expecting from him.

16                   I'm not trying to suggest to you that he didn't

17   understand what he was supposed to do.  What I am trying to

18   suggest to you is he really had no idea that he was going to be

19   volunteered for that position, really had no opportunity to say

20   no; but regardless of that, he said yes, and he signed onto the

21   role that he was asked to perform at that time.

22                   That role commenced on October 8, 2019, and the

23   Court made very clear at the time what that role involved, and

24   so did the order setting conditions of release, which were

25   spelled out, I believe, in document 30, where he signed his

04:26

1    name to those various things that are laid out.

2              A couple of key points that I just want to make,

3    Judge, because I think -- hopefully you will bear with me for a

4    second.  I do believe this is leading somewhere.

5              Number one, at the time that order was signed --

6    and the Court verified this on the record.  I have taken a look

7    at the transcript.  One of the first questions the Court asked

8    Mr. Jordan Satary when he was under oath is, "Are you living in

9    the same place?  Do you live in the same house as your father?"

10   and he answered that question affirmatively.  They were living

11   in the same place.

12             As a result of that conclusion that they were

13   living in the same place, the Court imposed the three

14   requirements that you have talked about earlier.  One is

15   basically to supervise.  Two is to make sure you use every

16   effort you can make to get your dad to show up in Court.

17   That's basically the second one.  The third one is to notify

18   the Court immediately if your dad violates a condition of

19   release or if he is no longer in your custody.

20             That was signed on -- I think the Court said

21   October 8, 2019, and at the time the Court may remember the

22   government was -- well, they didn't agree to the bond.  But

23   shortly thereafter, as the Court also noted, less than

24   two months after that, the Court consented to a bond amendment

25   which loosened up significantly on the defendant's travel.

04:28

1          Initially, the Court was very clear that he was

2     to stay within the state of Georgia unless given permission in

3     advance.  Not long after that, the government -- not these two

4     prosecutors here, some other prosecutors.  I think one was a

5     Mr. Loper -- agreed less than two months later to loosen up on

6     those bond requirements and to allow the defendant more leeway

7     with respect to his travel.

8          This is the point I was really trying to get to,

9     Judge, and you mentioned it a little bit earlier.  I think this

10     is very significant.  This is where I'm going to need, frankly,

11     some guidance from you, Your Honor.

12          On October 1, 2021, almost a year ago the

13     parties came to the Court with an agreement, a consent order,

14     asking you to do a couple of things which were key as it

15     relates to Jordan Satary's responsibilities with respect to his

16     father.  One of those things was to -- and I'm reading from

17     document 198 -- allow the defendant in this case to basically

18     travel unrestricted throughout the United States.  That was an

19     agreement that was reached by the defendant's lawyers and the

20     government.

21          The government presented that agreement to the

22     Court.  Based on the representations of the parties, the Court

23     signed an order stating, "Defendant may travel throughout the

24     lower 48 states so long as he notifies his probation officer

25     prior to his travel, including dates of travel."  I think the

04:29

1    reason offered in the motion is that the defendant was

2    promoting concerts throughout the United States and needed to

3    be at these various venues throughout the United States to

4    promote those concerts.  That's the employment that he was

5    engaged in at the time.

6               So the other part of that, which I think is

7    key -- and again this is based on the agreement that the

8    parties presented to the Court, not something the Court

9    obviously thought of on its own -- asked if the condition could

10   be amended to no longer require the father and the son to live

11   together.  In that same order, based on what the parties asked

12   the Court to do, the Court ordered, "The custodian requirement

13   is amended to make clear that defendant's custodian, Jordan

14   Satary, need not live in the same household as defendant."

15              Based on all of that, what we have as of

16   October 1, 2021, is a situation where -- the way that I'm

17   reading this, Judge, and the way that I felt like the Court was

18   reading it at the time -- and, again, I don't know what your

19   intentions were, Judge.  This is where I'm going to need some

20   help from you.  You said, "Jordan Satary remains defendant's

21   third-party custodian to ensure the presence of defendant at

22   any and all court proceedings."  So you made it very clear at

23   that point, "Look, you're still the custodian as it relates to

24   ensuring that your dad comes to court."

25              I honestly don't know what the Court's intention

04:31

1   was with respect to the first requirement that was originally

2   imposed which was, number one, again, that he was required to

3   supervise his father.  I do not think it's at all feasible for

4   him to supervise his father if his father is allowed to travel

5   freely throughout the United States basically unrestricted.  I

6   don't see how he can supervise him in that setting.

7           Again, he is not living with him anymore, so the

8   supervision requirement -- that's sort of up to what the Court

9   thinks, I think, at some level, as well as the requirement that

10   he notify the Court if he is no longer in Jordan Satary's

11   custody.  Certainly by allowing him to live somewhere else,

12   travel freely, unrestricted, those sort of things, I think that

13   essentially took him out of Jordan Satary's custody.

14           Of course, the Court was very, very clear, very

15   clear in that order that Jordan Satary was, no matter what,

16   required to ensure the presence of his father at any and all

17   court proceedings.  That requirement was clearly not

18   eliminated.

19           He has done what he could to get his dad here

20   today.  Based on what the government has told me -- and I don't

21   know a lot here.  I think I probably know less than anybody

22   here.  His father is obviously not here.  He has put his son in

23   a terrible position.  I would suggest to the Court that his son

24   was put in a terrible position initially, but he signed onto

25   that obligation and for a long period of time, ever since 2019

04:33   1   up until now, has satisfied his obligations.

2            The only other thing I will add is just to

3   reiterate that I think those obligations changed in October of

4   2021 when the parties came to the Court and asked you to change

5   things up significantly, Judge.

6            **THE COURT:**  All right, Mr. Lietz.  I would like to

7   hear from your client, from Mr. Satary.

8            **MR. LIETZ:**  Let me ask you this, Judge, and I'm

9   sorry.  I have had conversations with the government, and I

10  have some concerns about letting him answer questions for a

11  couple different reasons.

12           One, I'm not entirely sure what the nature of

13  the hearing is.  We certainly have no objection and think it

14  would be appropriate for him to be removed as the third-party

15  custodian.  We would agree with that.  I know that the Court's

16  order setting this show cause hearing, that we are here to show

17  cause why he shouldn't be removed.  We would like for him to be

18  removed.  Certainly we are not here to dispute that.

19           The nature of the concerns relate to, number

20  one, I'm not entirely clear what the nature of the hearing is.

21  Also, just to be real candid, the Court said in the order

22  setting this for a hearing that, "It has come to the Court's

23  attention that Jordan Satary may not be in compliance with the

24  terms of his third-party custodian agreement."

25           I'm not sure what the Court meant by that.  To

04:35

1    the extent that you intend to question him about those concerns

2    without providing us notice in advance, I don't know that I

3    would be doing my job for him to allow him to answer those

4    questions.  On top of all that, the government told me last

5    night that apparently there's an investigation concerning

6    health care fraud over in Houston, Texas, and I have not

7    received any assurance from them that Mr. Jordan Satary is not

8    a subject in that investigation or a subject in the

9    investigation concerning the whereabouts of his father.

10              So I'm not trying to be overly careful, but at

11   the same time I think -- because his father has put him in a

12   bad position and I'm not sure exactly what the Court is going

13   to ask or what the answers would be, I'm not entirely clear or

14   comfortable allowing the Court to ask him questions.

15             **THE COURT:**  On Friday of last week, December 9, I had

16   a previously scheduled status conference with all the attorneys

17   in Mr. Satary's case.  It had previously been scheduled --

18   which, by the way, ironically, Mr. Khalid Satary has always

19   been present or by phone on every status conference.  It was

20   something I think he wished to do, and his attorneys asked

21   early on if he could be present.  For the first time, he was

22   not present on the phone during the conversation.

23              The point of the status conference was to select

24   a new trial date because his attorneys have requested a

25   continuance because his attorney Ms. Clark-Palmer had a

04:37

1  conflict with a trial that she had beginning in Georgia in

2  January.  That was the entire point of the status conference,

3  to select a new trial date.

4          Immediately upon the beginning of the status

5  conference, Mr. Satary's attorney Mr. Grubman asked if he could

6  interrupt because he had information to provide.  That's when

7  he disclosed to the Court that he had been unable to contact

8  his client and had not been in contact with his client -- I

9  don't think he gave me a date specific, but it had been at

10 least a week at that time.

11         That is what prompted my order for Jordan

12 Satary, as third-party custodian to Mr. Khalid Satary -- that's

13 what prompted both my orders: number one, to order Khalid

14 Satary in so that I know whether he was going to show up, which

15 we have determined that he is not; and then, secondly, to find

16 out exactly what Mr. Jordan Satary knows, because one of the

17 responsibilities for Mr. Jordan Satary is to assure his

18 father's appearance and to notify the Court immediately if the

19 defendant violates a condition.  My understanding from

20 Mr. Grubman -- and he can speak to this -- is that he spoke to

21 Mr. Jordan Satary and --

22         Mr. Grubman, is that right?  Why don't you tell

23 me what you said on the phone about what Mr. Jordan Satary

24 advised.

25         **MR. GRUBMAN:**  Yes.  I simply, with Mr. Lietz'

04:39

1    permission, contacted Mr. Jordan Satary and asked him if he had

2    been in contact with his dad, at which point he said he had not

3    been in contact with his father since I think the same day

4    that -- the last day I had been in contact with his father.  He

5    told me he didn't know where his father was.

6              It's really everything Mr. Lietz said.  He told

7    me that his father had left him in a very bad position in

8    various different ways; and that he was trying to and would

9    continue to try to find his father and, if he did, he would let

10   us know.  At that time I told him he should probably -- I knew

11   he had had a lawyer from a while back, and I said he should

12   probably just reach out to Mr. Lietz.  I haven't talked to him

13   since.

14        **THE COURT:**  With that, Mr. Lietz, where I am with

15   this is primarily finding out if he knows where his father is,

16   but secondly he had a responsibility to notify the Court if his

17   father violated any condition.  Being a fugitive and not

18   appearing is a violation of the conditions of his release.  I

19   would like to find out more about when he last spoke to him and

20   when he realized that his father was gone.

21        **MR. LIETZ:**  I understand, Judge, why you want to get

22   to the bottom of this, and I don't blame you one bit.  A couple

23   of things you may or may not know because I don't know what the

24   government shared with you.

25              The government sent FBI agents, one or more

04:41

1   agents, to Jordan Satary's home on the 6th of December.  They

2   went to his home in the morning of December 6.  I can't speak

3   for them, but I think that they would say that he was very

4   cooperative in the sense that he didn't have to talk to them.

5   He answered all their questions.  Whatever they asked, he

6   answered.  Now, the government, if they disagree with that, it

7   may make sense to call the agent.  I know that that would

8   provide the Court more information.

9          What I do know is that later that same day, on

10  December 6, they called him back with some additional

11  questions, and he answered those questions as well.  At no

12  point during either of these interviews did he stop answering

13  their questions, say that he wouldn't answer any additional

14  questions, anything like that.  That was on December 6, and he

15  explained to them what he knew, when he last saw his father.

16  All that was discussed with them.

17         We talked with, I did, the prosecutors today and

18  basically asked them, "Are there any more questions that you

19  have?  Is there anything else that he can do to be helpful?"

20  If there's things that he can do to be helpful, we are willing

21  to consider it.  The concern that I have -- again, I go back to

22  the order where you said it's come to your attention that he

23  may not be in compliance with the terms of the custodial

24  agreement.  I'm not trying to just keep saying the same thing,

25  but it seems like that agreement was amended in October of

04:43   1   2021.

2           **THE COURT:**  Mr. Lietz, the agreement was, even your

3   reading, that he assures that his father appears in court.  His

4   father is not here.

5           **MR. LIETZ:**  I hundred percent agree.

6           **THE COURT:**  Okay.

7           **MR. LIETZ:**  I can proffer to the Court that he has

8   made every effort since this hearing was set to get his father

9   there.  He has done everything that he knew to do to get his

10  father to court today.  He has done that.

11          If the government is of the view that he somehow

12  violated this third-party custodial agreement -- and, again,

13  I'll be candid.  I've been doing federal criminal defense for a

14  long time, but I have never encountered anything like this.

15  The fact of the matter is if his dad were in court, if the

16  government wanted to revoke his father's bond, we would be

17  proceeding under 18 U.S.C. § 3148.  They would have to put up

18  evidence.  We would get notice of what they are saying.  We

19  would get an opportunity to cross-examine their agents.

20          If there is a claim that he violated the

21  third-party custodial agreement, I think the government -- if

22  that's their position, we need to hear evidence.  I'm not

23  comfortable just having him stand up here and asked questions.

24  I don't know what the questions are.  I don't know what the

25  answers are going to be necessarily because I don't know what

04:44   1   the questions are.

2               He is willing to cooperate.  He already

3   cooperated twice.  If there's a way to work out additional

4   details with them, we will, but I think at this point I would

5   not be doing him a service if I allowed him to just stand up

6   under oath and answer the Court's questions.  That has nothing

7   to do with the fact -- I don't think he would be dishonest.  I

8   don't think he would be deceitful.  I don't think he would be

9   uncooperative.  But me standing here as his lawyer, I'm not in

10   a position to allow him to do that.  I'm trying to be as

11   respectful as I can, but I can't do that, Judge.

12               **THE COURT:**  Ms. Contreras, the probation officer --

13               **THE PROBATION OFFICER:**  Yes, Your Honor.

14               **THE COURT:**  This is Iris Contreras, United States

15   probation officer.

16               Have you been in touch with the probation

17   officer in Houston who was supervising Mr. Satary?

18               **THE PROBATION OFFICER:**  Yes, I have, Your Honor.

19               **THE COURT:**  Did Mr. Jordan Satary advise the

20   probation officer that he was unable to locate his father?

21               **THE PROBATION OFFICER:**  No, he did not.

22               **THE COURT:**  Did he advise you in the probation

23   office?

24               **THE PROBATION OFFICER:**  No.

25               **THE COURT:**  Did he advise, to your knowledge, any

04:45

1   court official that he could not locate his father and didn't

2   know where he was?

3         **THE PROBATION OFFICER:**  No, Your Honor.

4         **MR. LIETZ:**  May I ask her some questions?

5         **THE COURT:**  Of course you may.

6         **MR. LIETZ:**  What's your name again?

7         **THE PROBATION OFFICER:**  Iris Contreras.

8         **MR. LIETZ:**  So it's my understanding based on what I

9   have heard -- and I'm not sure how much of this is accurate,

10  but at some point the government went to a judge somewhere and

11  got a warrant for the defendant -- that Satary, I'm going to

12  call him the defendant -- got a warrant to arrest the

13  defendant.  Are you familiar with that?

14        **THE PROBATION OFFICER:**  Yes, I am.

15        **MR. LIETZ:**  When was that warrant obtained?

16        **THE PROBATION OFFICER:**  I don't have that in front of

17  me, but that was obtained maybe about a week or two ago, about

18  two weeks ago.

19        **MR. WOODARD:**  November 23.

20        **MR. LIETZ:**  So on November 23 a warrant was obtained

21  for the defendant's arrest?

22        **THE PROBATION OFFICER:**  Correct.

23        **MR. LIETZ:**  It's my understanding at sometime after

24  that warrant for his arrest was obtained that the probation

25  officer supervising the defendant in Houston called the

04:46

1    defendant on the phone and said, "I would like for you to come
2    in."
3                 THE PROBATION OFFICER:  Correct.
4                 MR. LIETZ:  That meeting was set for what day?
5                 THE PROBATION OFFICER:  December 1.
6                 MR. LIETZ:  That's Thursday, December 1.
7                 THE PROBATION OFFICER:  Yes.
8                 MR. LIETZ:  I think this goes without saying, but I'm
9    assuming, when the defendant was called, he wasn't told,
10   "There's a warrant out for your arrest."
11                THE PROBATION OFFICER:  Correct.
12                MR. LIETZ:  So as of Thursday, December 1, the
13   defendant had a meeting set up with his probation officer in
14   Houston, Texas, correct?
15                THE PROBATION OFFICER:  Correct.
16                MR. LIETZ:  What happened at that meeting?
17                THE PROBATION OFFICER:  He did not appear.  The
18   defendant did not appear.
19                MR. LIETZ:  So on Thursday, December 1, the defendant
20   did not appear?
21                THE PROBATION OFFICER:  Correct.
22                MR. LIETZ:  Is that right?
23                THE PROBATION OFFICER:  Correct.
24                MR. LIETZ:  Did anyone go out and attempt to arrest
25   the defendant at that point?

04:47

1    **THE PROBATION OFFICER:**  No.  It is my understanding

2    there was a special agent looking for the defendant.  I don't

3    know what communication happened from thereon.  I understand

4    that Officer Salinas from Houston, Texas, did communicate with

5    Special Agent Brown as far as trying to locate the defendant.

6        **MR. LIETZ:**  It's my understanding -- correct me if

7    I'm wrong -- that after that meeting didn't take place because

8    the defendant didn't show up on Thursday, December 1, that

9    agents then went to the defendant's home on December 6.

10       **THE PROBATION OFFICER:**  I don't have any knowledge of

11   that information.

12       **MR. LIETZ:**  So you're not aware of that?

13       **THE PROBATION OFFICER:**  I'm not aware of that.

14       **MR. LIETZ:**  Are you not aware of the fact that agents

15   also went to Jordan Satary's home on December 6?

16       **THE PROBATION OFFICER:**  I was not aware of that.  I

17   do want to mention that the defendant did give a reason

18   regarding Mr. Jordan Satary as not appearing to his meeting in

19   Houston, Texas.

20       **MR. LIETZ:**  Wait.

21       **THE PROBATION OFFICER:**  So Mr. Satary at one point on

22   December 1 --

23       **MR. LIETZ:**  Let me stop you right there.  I just want

24   to make sure I know what Satary we are talking about.

25       **THE PROBATION OFFICER:**  Defendant.

04:48

1           **MR. LIETZ:**  So the defendant was supposed to show up

2  on December 1.  Go ahead, ma'am.

3           **THE PROBATION OFFICER:**  Later, after not appearing on

4  December 1, the defendant was in communication with

5  Officer Salinas in Houston, Texas, and informed Officer Salinas

6  in Houston, Texas, that he was unable to appear due to Jordan

7  Satary being in the hospital.

8           **MR. LIETZ:**  Oh, okay.  So the dad told the probation

9  officer that he couldn't appear because his son was in the

10  hospital?

11           **THE PROBATION OFFICER:**  That's correct.

12           **MR. LIETZ:**  Which we know to be a flat-out lie.

13           **THE PROBATION OFFICER:**  Well, we have to ask

14  Mr. Jordan Satary if he was or was not in the hospital.

15           **MR. LIETZ:**  What did he say about the specifics of

16  why he was in the hospital?

17           **THE PROBATION OFFICER:**  He just said he would

18  reschedule another visit with another date and after that was

19  nonresponsive.

20           **MR. LIETZ:**  Was another date scheduled?

21           **THE PROBATION OFFICER:**  No, because he never called

22  back.

23           **MR. LIETZ:**  Did he say what the nature of the

24  condition was?

25           **THE PROBATION OFFICER:**  No, he did not.  He just said

04:49  1  he was in the ER.

2          **MR. LIETZ:**  I'm sorry I cut you off.  Did he say what

3  hospital?

4          **THE PROBATION OFFICER:**  No, he did not.

5          **MR. LIETZ:**  Did the probation officer ask?

6          **THE PROBATION OFFICER:**  I believe not.

7          **MR. LIETZ:**  Let me get this straight.  As of

8  Thursday, December 1, there was a federal warrant for the

9  arrest of the defendant in this case?

10         **THE PROBATION OFFICER:**  Correct.

11         **MR. LIETZ:**  As of Thursday, December 1, the defendant

12 told the probation officer that his son was in the emergency

13 room and he couldn't go to see the probation officer?

14         **THE PROBATION OFFICER:**  Correct.

15         **MR. LIETZ:**  But yet the probation officer didn't ask,

16 "What hospital are you in?"

17         **THE PROBATION OFFICER:**  Correct.

18         **MR. LIETZ:**  The probation officer didn't set up

19 another meeting for the defendant to come in?

20         **THE PROBATION OFFICER:**  Correct.

21         **MR. LIETZ:**  Is it fair to assume that the probation

22 officer basically just took the defendant's word for it?

23         **THE PROBATION OFFICER:**  Well, he had no other way to

24 communicate with the defendant after that.

25         **MR. LIETZ:**  Let me ask you this.  In connection with

04:50

1    a probation officer's job to supervise a defendant, a probation

2    officer has to make him or herself very familiar with the bond

3    paperwork, correct?

4            **THE PROBATION OFFICER:**  Correct.

5            **MR. LIETZ:**  All of the conditions of release that the

6    judge set?

7            **THE PROBATION OFFICER:**  Correct.

8            **MR. LIETZ:**  In this particular case, the probation

9    office was aware that the judge actually set a third-party

10   custodial agreement in place with respect to Mr. Jordan Satary?

11           **THE PROBATION OFFICER:**  Yes.

12           **MR. LIETZ:**  Can you tell me, after learning that the

13   defendant said that his son was in the hospital, when somebody

14   from the probation office, either here or in Houston, called

15   Mr. Jordan Satary?

16           **THE PROBATION OFFICER:**  No, there was no

17   communication to Mr. Jordan Satary.

18           **MR. LIETZ:**  So nobody called the third-party

19   custodian?

20           **THE PROBATION OFFICER:**  That is correct.

21           **MR. LIETZ:**  Why would that be?

22           **THE PROBATION OFFICER:**  There could be several

23   reasons.  The last time they did speak to the third-party

24   custodian was under another officer, Mr. Mike Cannon -- that

25   was in March of 2022 -- just to kind of get information, build

04:51

1   rapport.  That should have been Mr. Salinas' next step.  I

2   don't know if his office has a protocol or policies in place on

3   how they operate.  The case is not in my jurisdiction and to

4   which I did not call Mr. Jordan Satary.

5            **MR. LIETZ:**  Again, I'm not faulting you, but what you

6   said is very important.  There were previous occasions when

7   somebody from the probation office reached out to Jordan

8   Satary?

9            **THE PROBATION OFFICER:**  Correct.

10            **MR. LIETZ:**  Because, again, he was the third-party

11   custodian?

12            **THE PROBATION OFFICER:**  Correct.

13            **MR. LIETZ:**  The probation office wanted to have a

14   good rapport with him?

15            **THE PROBATION OFFICER:**  Correct.

16            **MR. LIETZ:**  To be able to rely on him and communicate

17   with him?

18            **THE PROBATION OFFICER:**  Correct.

19            **MR. LIETZ:**  As a result of wanting that, the

20   probation office had Mr. Jordan Satary's phone number?

21            **THE PROBATION OFFICER:**  Yes.

22            **MR. LIETZ:**  As far as you know, there were no

23   difficulties that your office had ever getting in touch with

24   Mr. Jordan Satary?

25            **THE PROBATION OFFICER:**  That is correct.

04:52

1        **MR. LIETZ:**  It's just that this particular occasion

2   from December 1, when the dad said he couldn't show up to an

3   appointment that was previously set, nobody actually made an

4   effort to call Jordan Satary?

5        **THE PROBATION OFFICER:**  Correct.

6        **MR. LIETZ:**  Based on what you know about his prior

7   experience, is it fair to say Jordan Satary would have -- you

8   had the number, correct?

9        **THE PROBATION OFFICER:**  He would have called -- I

10  mean spoken to me, yes.

11       **MR. LIETZ:**  There's no indication that he wouldn't

12  have spoken to you?

13       **THE PROBATION OFFICER:**  That's correct.

14       **MR. LIETZ:**  Based on the work that you have done in

15  connection with your job as a probation officer in this case

16  and getting ready for this hearing, when was Jordan Satary

17  first notified that his dad was subject to a federal arrest

18  warrant?

19       **THE PROBATION OFFICER:**  I don't have any information

20  on that.

21       **MR. LIETZ:**  I think you said that you're not aware of

22  the fact that federal agents went to Jordan Satary's home on

23  December 6?

24       **THE PROBATION OFFICER:**  That's correct.

25       **MR. LIETZ:**  Which is obviously five days after the

04:53   1   meeting that was supposed to take place.

2                   THE PROBATION OFFICER:  Correct.

3                   MR. LIETZ:  You don't have any evidence or

4   information to suggest that anybody reached out to Jordan

5   Satary before December 1?

6                   THE PROBATION OFFICER:  Correct.

7                   MR. LIETZ:  You can't obviously sit here today and

8   say anything about when Jordan Satary knew that his father had

9   basically absconded from his bond.

10                  Do you know how many court appearances the

11  defendant has had in this case starting from when the judge

12  initially issued this bond back in 2019 up until this day?

13                  THE PROBATION OFFICER:  Several.

14                  MR. LIETZ:  Several?

15                  THE PROBATION OFFICER:  I would say several.  I have

16  seen the docket and it was lengthy, so longer than normal.

17                  MR. LIETZ:  His lawyers have filed a lot of motions

18  in this case, right?

19                  THE PROBATION OFFICER:  Correct.

20                  MR. LIETZ:  They have had to come to court a lot of

21  times.  It's probably fair to say that he has been to court

22  dozens of times?

23                  THE PROBATION OFFICER:  More than a dozen times.

24                  MR. LIETZ:  More than a dozen times, and there has

25  never been one instance until today that the defendant has not

04:54   1    showed up?

2              THE PROBATION OFFICER:  Correct.

3              MR. LIETZ:  So would you agree that up until today

4    Jordan Satary has done a good job getting his dad to court?

5              THE PROBATION OFFICER:  Yes.

6              MR. LIETZ:  Thank you for your time, ma'am.  I

7    appreciate that.

8              THE COURT:  Mr. Woodard, do you have any questions

9    for Ms. Contreras?

10             MR. WOODARD:  Just briefly, Your Honor.

11             Were you aware that Mr. Jordan Satary was

12   interviewed by federal agents on December 6?

13             THE PROBATION OFFICER:  No, I was not.

14             MR. WOODARD:  Did you know that Jordan Satary told

15   agents that he had last spoken to his dad on December 2, which

16   was the day after Khalid Satary was supposed to appear to

17   probation?

18             THE PROBATION OFFICER:  No.

19             MR. WOODARD:  Did you know a car that registered to

20   Jordan Satary was pinging in California a day after Mr. Khalid

21   Satary was supposed to appear to probation in Houston?

22             THE PROBATION OFFICER:  No, I was not.

23             MR. WOODARD:  It wasn't just the probation office

24   investigating this case; is that right?

25             THE PROBATION OFFICER:  That is correct.

04:55

1           **MR. WOODARD:**  It was also a team of federal agents?

2           **THE PROBATION OFFICER:**  Correct.

3           **MR. WOODARD:**  Who are gathering information to this

4    date about this investigation, talking to the third-party

5    custodian, and other things?

6           **THE PROBATION OFFICER:**  Yes.

7           **MR. WOODARD:**  May I have a moment, Your Honor?

8           **THE COURT:**  Of course.

9           **MR. WOODARD:**  Ms. Contreras, did you review a memo

10   supporting an arrest warrant for Khalid Satary prepared by the

11   government?

12          **THE PROBATION OFFICER:**  Yes, ma'am.

13          **MR. WOODARD:**  Do you remember Jordan Satary being

14   mentioned in that memorandum?

15          **THE PROBATION OFFICER:**  Yes, ma'am.

16          **MR. WOODARD:**  Do you remember -- and you don't have

17   to get into details -- whether it mentioned that Jordan

18   Satary --

19          **MR. LIETZ:**  Judge, certainly pursuant to Jencks I

20   would like to see a copy of that.

21          **MR. WOODARD:**  That's attorney work product prepared

22   by the government.

23          **MR. LIETZ:**  Well, I don't think the government can

24   ask about something that I haven't seen and ask the Court to

25   rely upon it if they are not going to give me a copy.

04:56

1       **THE COURT:**  For purposes of this hearing, what is the

2   relevance of that?

3       **MR. WOODARD:**  Your Honor has made clear that a

4   violation of the third-party custodian agreement would be

5   knowing that Mr. Jordan Satary's father was violating

6   conditions of his bond.  Evidence presented in support of the

7   arrest warrant for Khalid Satary referenced Jordan Satary's

8   living in Houston and at least being named on documents related

9   to the Houston labs, Your Honor.

10       **THE COURT:**  My focus is on the defendant's

11   nonappearance and his obligation to have him appear in court,

12   and I would like to keep the focus to that.

13       **MR. WOODARD:**  Understood Your Honor.  Withdraw that

14   last series of questions.  No further questions, Your Honor.

15       **THE COURT:**  Ms. Contreras, I think you said this

16   before.  I just want to be clear.  Mr. Jordan Satary's attorney

17   asked you if anyone from the government advised you that they

18   had spoken to Jordan Satary.  Did Jordan Satary contact any

19   probation officer or any court personnel to advise that he

20   could not locate his father?

21       **THE PROBATION OFFICER:**  No, Your Honor.

22       **MR. LIETZ:**  May I have a brief follow-up?

23       **THE COURT:**  Yes.

24       **MR. LIETZ:**  Just to get the chronology clear, the

25   meeting was supposed to take place on December 1, correct?

04:57
1      THE PROBATION OFFICER:  Correct.

2      MR. LIETZ:  You're not aware of the fact that agents

3 went to Jordan Satary's home on December 6, correct?

4      THE PROBATION OFFICER:  Correct.

5      MR. LIETZ:  So clearly as of December 6, if the

6 agents went there as of that date, they had already talked to

7 Jordan Satary, correct?

8      THE PROBATION OFFICER:  But we are different

9 entities.  So Mr. Jordan Satary is still obligated, whether

10 speaking to any other law enforcement agent, to still contact

11 either myself or Officer Salinas.

12      MR. LIETZ:  Obligated to do what, now?  I didn't --

13      THE PROBATION OFFICER:  To contact either myself or

14 Officer Salinas.

15      MR. LIETZ:  For what reason?

16      THE PROBATION OFFICER:  For reasons of the bond.

17      MR. LIETZ:  What was the obligation that he had to

18 contact you?

19      THE PROBATION OFFICER:  If he is unable to have any

20 communication with his dad or he doesn't know where his dad is.

21 So if he believes that, you know, his dad is missing or even --

22 missing.  It couldn't be absconding.  Let's just say his dad

23 was in a car accident or something and missing.  He still is to

24 notify us.

25      MR. LIETZ:  Now, did you have a chance to look at the

04:58    1    order that the judge signed back on --

2              THE PROBATION OFFICER:  I did.

3              MR. LIETZ:  Okay.  You are aware of the fact that

4    based on the agreement that the parties submitted to the Court

5    that the defendant was no longer required to live with his son?

6              THE PROBATION OFFICER:  Living is one thing.  Still

7    having communication is another.

8              MR. LIETZ:  Well, you are not saying that he had to

9    talk to his dad every day, are you?

10             THE PROBATION OFFICER:  I'm saying that the moment he

11   was suspicious of his dad's whereabouts or -- the moment his

12   dad's whereabouts became unknown to him, there was an

13   obligation on him to contact myself or Officer Salinas.

14             MR. LIETZ:  When did his dad's whereabouts become

15   unknown to him?

16             THE PROBATION OFFICER:  That's what we need to find

17   out.

18             THE COURT:  That's exactly what we are trying to get

19   to, Mr. Lietz.

20             THE PROBATION OFFICER:  That's what we need to find

21   out.

22             MR. LIETZ:  Okay.  Well, you are not saying that he

23   knew -- I thought you were saying that he didn't satisfy his

24   obligations of the Court to reach out.

25             THE PROBATION OFFICER:  That's what we are saying.

04:59

1    So the moment he is under the impression that his father's

2    whereabouts are unknown, his obligation is to reach out to

3    myself or to Officer Salinas.

4            MR. LIETZ:  Okay.  You are aware of the fact that,

5    under the bond conditions that were amended, his dad was

6    allowed to travel freely throughout the United States?

7            THE PROBATION OFFICER:  That is correct.

8            MR. LIETZ:  When did the probation office try to

9    reach out to the dad after the dad canceled the meeting on

10   December 1?

11           THE PROBATION OFFICER:  I don't have a specific date

12   on that, but there was another contact made by Officer Salinas

13   to the defendant's phone number in which it was going straight

14   to voice mail.

15           MR. LIETZ:  Okay.  When did anybody notify the judge

16   here of this issue, the probation office?

17           THE PROBATION OFFICER:  November 21, 22, around

18   there.

19           MR. LIETZ:  Ma'am, I don't think I have any more

20   questions.  Thank you.  I appreciate it.

21           THE PROBATION OFFICER:  May I be excused?

22           THE COURT:  Yes, yes.  Thank you, Ms. Contreras.

23               Mr. Lietz, that's the issue for the Court.  My

24   issue is what you started with when you came to the podium

25   saying that the defendant has left his son in a very difficult

05:01

1    situation.  He has absconded.

2            **MR. LIETZ:**  Yes.

3            **THE COURT:**  You have acknowledged that.  Defendant's

4    counsel acknowledged that last week, which is what brought all

5    this to our attention.  What I am trying to get at is what does

6    your client know about his disappearance and when did he find

7    out about it because he did have an obligation to notify the

8    Court, and there's no evidence that he did that.

9            **MR. LIETZ:**  Okay.  I hear you, but I don't think

10   there's any evidence that he knew his dad had absconded.

11   There's no evidence.  We haven't heard any evidence.  It's one

12   thing for the government to come in and meet with you ex parte

13   and tell you whatever they want to tell you.  I'm not

14   suggesting that they wouldn't tell you something that they

15   don't believe.  But if they have evidence to present, let them

16   present evidence.

17            I do not believe that Jordan Satary has any

18   obligation, as we sit here today in connection with this order

19   to show cause, specifically an order to show cause why his

20   third-party status should not be revoked -- I don't believe we

21   have any obligation to present evidence.  We agree that his

22   third-party status should be revoked simply because he made

23   every effort since Friday to get his dad here.  His dad is not

24   here.  There's no purpose in even having him a third-party

25   custodian.  Yes, his father has put him in a bad position, but

05:02

1  I frankly think it seems -- if they have evidence of that, let
2  them put the evidence up.
3          **THE COURT:**  Mr. Woodard, do you want to call anyone?
4  Do you want to call the agent?  Because it appears clear that
5  Mr. Jordan Satary has chosen not to assist or to say anything
6  to the Court.
7          **MR. LIETZ:**  Let me say this, if I may, Judge.
8  Jordan Satary -- if they put up evidence -- I hope they do
9  because I hope it will be --
10         **THE COURT:**  Let me just go back on what you said when
11  you just indicated that if the Court were going to hear and
12  just rely on ex parte communications with the government --
13  which I'm not certain why you say that, but I find that that's
14  unfounded because I want to make clear what brought all this to
15  light is the defendant's attorney who, in communication with
16  all of us, brought this to my attention.  He is the one who
17  advised that the defendant had absconded and he had not been
18  able to get in touch with him for over a week.
19         **MR. GRUBMAN:**  Your Honor, if I may, this is Scott
20  Grubman for the defendant.  I think maybe what Mr. Lietz is
21  referring to, I did tell Mr. Lietz that during our pretrial
22  conference --
23         **THE COURT:**  Status conference.
24         **MR. GRUBMAN:**  -- the government requested an ex parte
25  conference with the Court, which was granted.  So I think

05:04   1   that's probably what he is referring to.

2           THE COURT:  After the fact the government requested

3   or asked if I wanted additional information about the arrest

4   warrant, after you notified me that you had been unable to get

5   in touch with your client and we realized that he may have

6   absconded.

7           MR. LIETZ:  Judge, may I say this?  I'm not

8   suggesting that either the government or certainly the Court

9   did anything wrong, but what I am suggesting or what I am

10  saying is the agents went to Jordan Satary's home on

11  December 6.  He told them everything that he knew about his

12  father.

13              According to their own reports, he told them

14  that the last time he saw his dad was on Friday, December 2.

15  Friday, December 2, according to the government's own reports,

16  is the last time that he saw his father.  I can also tell the

17  Court --

18          THE COURT:  So you're saying, Mr. Lietz, that

19  Mr. Satary knew from December 2 until at least December 6, when

20  the agents went to his house, that his father was gone.

21          MR. LIETZ:  I'm saying --

22          THE COURT:  That just goes right back to what I'm

23  saying, that he didn't notify the Court.

24          MR. LIETZ:  I'm saying, Judge, if you want to accept

25  that as true -- that's what the government's report says.  I'm

05:06

1    happy with the Court accepting that as true for purposes of

2    this hearing.  I'm not entirely sure what the purpose of the

3    hearing is at this point, but let me just say I disagree

4    substantively.

5              So let's assume that he knew on December 2.  He

6    didn't talk to his dad on December 2.  We now know that his

7    father told the probation office that his son was in the

8    hospital, which I can tell the Court is a lie.  That's a

9    flat-out lie.  We also know that the probation office had

10   Jordan Satary's phone number, had contacted him many times

11   before.  He was always cooperative.

12             Jordan Satary, let's assume he knew as of

13   December 2 he couldn't get in touch with his dad.  His dad had

14   permission to travel throughout the entire country without even

15   getting permission in advance.  He could travel where he

16   wanted, when he wanted in the lower 48 states without even

17   having to get permission from the probation officer.

18             What Jordan Satary also told the agents, I

19   believe, is he doesn't check in with his father every day.  He

20   is not living with him anymore.  The nature of the relationship

21   was they didn't talk every day or even every other day.  Some

22   days they talked regularly; some days they didn't.  They didn't

23   live in the same house, so it wasn't unusual to Jordan Satary

24   to go several days without speaking with his father.

25             I believe he told the agents that or something

05:07

1    to the effect.  If the government wants to put that evidence

2    up, that's fine.  He wants to be cooperative.  If there's a way

3    we can work this out, we will work it out.  We will be

4    cooperative.

5              The problem I have is that the government stood

6    up in court today and said they have Jordan's name on some

7    documents concerning a health care fraud investigation down

8    here.  Yesterday they told me they had no evidence that Jordan

9    put his name there.  His dad has put his name there.  His dad

10   put his wife's name there.  His dad has put many people in a

11   bad position, including his son.

12             The Court obviously wants to find the defendant.

13   We want the Court to find him too, but I don't want the son to

14   be held responsible for that; because I don't believe he did

15   anything wrong, but I am not comfortable allowing him just to

16   answer questions.  I don't think any lawyer in my shoes would

17   allow anything like that.  I'm sorry, Judge.  He wants to be

18   cooperative.  He would come up here and answer questions.

19             **THE COURT:**  What was the last communication he had

20   with his father?

21             **MR. LIETZ:**  My understanding, based on the report

22   that the government provided me, was that he explained to the

23   agents --

24             **THE COURT:**  I don't need to have the report

25   regurgitated to me.

05:09

1          **MR. LIETZ:**  Friday, December 2 is what the report

2     says.  I'm relying on the report for that.

3          **THE COURT:**  Your client is raising his hand.

4          **MR. JORDAN SATARY:**  If I may just have a word with

5     him.

6          **THE COURT:**  Put on the music, Melissa.

7          (Off the record.)

8          **MR. LIETZ:**  Your Honor, my understanding is that the

9     last time he saw -- well, the last time he communicated with

10    his father was on Thursday, December 1, or Friday, December 2.

11    There are some things that we could look at to confirm that.

12              The other thing I wanted to mention -- and I can

13    certainly give the Court a copy of this and the government --

14    is that on November 11, 2022, Jordan Satary was involved in a

15    wreck, and the police report in connection with that wreck

16    shows that his vehicle was towed on Friday, November 11, 2022.

17              The information that we have would also show

18    that on -- I believe it's a Tuesday.  Don't quote me on that,

19    but it definitely was November 15, 2022.  Jordan Satary,

20    because his car had been towed as a result of the accident, he

21    didn't have a vehicle, rented a Toyota Highlander on

22    November 15, 2022.  I think the government previously told me

23    that the rental occurred sometime close in time to his dad,

24    I'll say, absconding, but the rental occurred on November 15,

25    2022.

05:12

1    **MR. WOODARD:**  Your Honor, if I could object to -- and
2    this will be the last time I call Mr. Lietz before a hearing to
3    try to work things out because that's not something I said.
4         To get to the chronology, Your Honor, December 2
5    apparently is the last time Jordan spoke to his dad.  In a
6    statement to the government, he stated that on the weekend of
7    December 3 through 4, he dropped the rental car off at Khalid
8    Satary's home.  Either he talked to Mr. Khalid Satary that day
9    or Mr. Khalid Satary was not present.  Either way, he did not
10   inform anyone about Mr. Khalid Satary's absence.  Our phone
11   toll records show that he has not tried to contact his father
12   until yesterday, December 11.
13        We think that as an officer of the Court, the
14   Court obviously has the ability to question -- I'm sorry, a
15   custodian who owes an obligation to the Court, and the Court
16   can question Mr. Jordan Satary.
17        **THE COURT:**  Mr. Grubman is trying to get our
18   attention.
19        **THE DEPUTY CLERK:**  Can you hear me now, Mr. Grubman?
20        **THE COURT:**  One moment.
21        Ms. Clark-Palmer, can you hear?
22        **THE DEPUTY CLERK:**  Can you hear anything now?
23        **THE COURT:**  Can they dial in on the phone number?
24   Can you disconnect the Zoom and have them dial in?
25        We are working on the IT issues.

05:17

1        (Recess.)

2        **THE COURT:**  Mr. Pogozelski.

3        **MR. POGOZELSKI:**  Yes.  If I may just make a few

4  remarks on behalf of the government, Your Honor.

5            The whole purpose of a third-party custodian

6  requirement, as the Court obviously knows, is to provide

7  additional incentive for a defendant not to violate bond or

8  flee, and a third-party custodian willingly undertakes that

9  obligation.

10           As the Court repeated earlier, Mr. Jordan Satary

11  was advised in open court about that obligation and his father

12  understood, as the Court said, "You're putting your son's name

13  on the line."  The defendant is not here.  As the third-party

14  custodian, Mr. Jordan Satary is obligated to answer the Court's

15  questions about whether he actually violated any of the

16  conditions of his placement as a third-party custodian.

17           Ironically -- I know it's a different

18  district -- I had a similar issue very recently in October with

19  a third-party custodian.  In our bond order, it clearly said

20  the third-party custodian is subject to contempt if it is

21  determined they have violated their obligations as a

22  third-party custodian.

23           It's his job to get up and tell us and answer

24  questions whether he did his job as a third-party custodian.

25  The government doesn't have to present any evidence about that.

05:24

1            **MR. LIETZ:**  Judge, may I respond briefly to that?  I

2    think the thing that the government is either forgetting or

3    ignoring is that in October of 2019, the government came to the

4    Court and said, "We are okay not requiring the defendant to

5    live with his son anymore.  We know that that was the

6    requirement originally, but we are okay with that not occurring

7    anymore.  By the way, Judge, as the government, we are okay

8    allowing him to travel throughout the United States with no

9    permission in advance."

10            **THE COURT:**  Wait.  I don't think that's right.

11   That's not what the order says.  It says with notice.

12            **MR. LIETZ:**  What the order says is that he has to --

13            **THE COURT:**  It says, "Defendant may travel throughout

14   the lower 48 states so long as he notifies his probation

15   officer prior to his travel, including dates of travel."

16            **MR. LIETZ:**  I agree, but what I said -- and I'm

17   sorry.  He didn't have to get the permission of his probation

18   officer.  To get permission, you have to submit your travel

19   plans generally, as I understand it, 10 days in advance.  All

20   he had to do was notify his probation officer to let the

21   probation officer know where he was going, when he was going,

22   and there was no 10-day requirement before that.

23                To the extent the government has authority that

24   Jordan Satary is obligated to come into court and answer these

25   questions at this point, I think they should produce that

05:26

1    authority.  I would like to see that authority.  I don't think

2    that authority -- I haven't seen it.  I guess I can't say it

3    doesn't exist, but it sounds like the other case that the

4    government was involved in was different because the language

5    of the order may have been different, but to the extent that

6    there's a --

7              THE COURT:  Well, we have the Court order that Jordan

8    Satary signed.

9              MR. LIETZ:  Absolutely.

10             THE COURT:  It says that he agrees to notify the

11   Court immediately if the defendant violates a condition of

12   release or is no longer in the custodian's custody.

13             MR. LIETZ:  I agree with that, which again that was

14   amended.  How could his father be in his custody anymore after

15   the government gave him permission to live somewhere else and

16   travel freely?

17             THE COURT:  It was never amended to take out that it

18   was his responsibility to notify the Court.  Where was that

19   taken out?  Show me.

20             MR. LIETZ:  My understanding of what was left in just

21   simply comes from the order that you signed on the 1st of

22   October where you said, "Jordan Satary remains defendant's

23   third-party custodian to ensure the presence of defendant at

24   any and all court proceedings."

25             THE COURT:  Oh, Mr. Lietz.  Oh, Mr. Lietz.  I don't

05:28

1    know you at all.  I have got R. Doc. 30, which has three pages

2    of what Jordan Satary agreed to do.

3              MR. LIETZ:  Yes, Judge.

4              THE COURT:  Those aren't all listed.  Is your

5    argument that all of those have now been removed because they

6    were not put in an amended order?

7              MR. LIETZ:  No, Judge.  My argument is this.  When

8    you signed that, document 30, you required the defendant to

9    live with his son.  That was a requirement.  You also

10   required --

11             THE COURT:  And I lifted that.

12             MR. LIETZ:  -- Jordan Satary to supervise his father.

13   That was also a requirement.  My only point is I'm not sure

14   what the nature of those requirements would have been after the

15   government agreed to allow Jordan Satary to live separately

16   from his father and to travel freely.  How in the world is he

17   supposed to supervise his dad, have his dad in his custody if

18   his dad is living somewhere else?

19             THE COURT:  Nobody is saying that, are we?

20             MR. LIETZ:  I'm not sure.

21             THE COURT:  Did anyone say anything about custody?

22   I'm saying it again.  I think I have said it five times.  His

23   obligation was to notify the Court immediately if the defendant

24   violates a condition of release or if he is no longer in

25   custody.  He has not done that.  We have got the evidence now

05:29

1  from the probation officer that he, Mr. Jordan Satary, never

2  notified anyone on his own.

3          **MR. LIETZ:**  Let me ask a follow-up.  I think you said

4  that his obligation was to notify the Court if he, the father,

5  was no longer in Jordan's custody.

6          **THE COURT:**  If he violates a condition of release or

7  is no longer in the custodian's custody.  That's what the

8  paperwork says.

9          **MR. LIETZ:**  Respectfully, if he is living -- I'm not

10  even sure what it would mean for him to be in his son's custody

11  after the government agreed for him to live somewhere else.

12          **THE COURT:**  What about violating a condition of his

13  release?

14          **MR. LIETZ:**  I'm with you on that.  I'm not saying

15  that that has been removed.  I think if he became aware of his

16  dad violating a condition of his release, certainly.  Also, you

17  very clearly said in the order that he was to make every effort

18  to get his dad to show up in court.  That's clearly not

19  eliminated.

20          **THE COURT:**  You have said that he was aware that his

21  father was incommunicado and/or absconded somewhere around

22  December 2.

23          **MR. LIETZ:**  No, I never said he was aware that his

24  dad absconded.  He didn't know his dad absconded until

25  December 6 when the agents came looking for him.

05:30

1          THE COURT:  Okay.  December 6.

2          MR. LIETZ:  December 6.  The agents came looking for

3    him December 6.  By the way, nobody called him from the point

4    in time where his dad was supposed to show up and told them

5    that Jordan was in the hospital.  He knew his dad absconded on

6    December 6 when the agents came out to his house and told --

7          THE COURT:  When did he notify the Court?

8          MR. LIETZ:  When did he notify the Court?  I mean,

9    presumably the Court knew as of December 6 when the agents came

10   out to his house.

11         THE COURT:  When did he notify the Court?

12         MR. LIETZ:  I don't know that he did notify the Court

13   because he learned it after the Court learned it.  The Court

14   learned about it certainly by December 6.

15         THE COURT:  So if you find something out by some

16   other avenue, then he doesn't have any responsibility because

17   the Court should have known it?  He had a responsibility.  So

18   what I intended today was very clear because I didn't notice a

19   contempt hearing.  That was not the intent today, but now I

20   will notice a contempt hearing.

21         MR. LIETZ:  Judge, I wish you wouldn't do that.

22         THE COURT:  Well, there's a way to do this,

23   Mr. Lietz.  I've made very clear what I want to know is what he

24   knew about his father disappearing.

25              I'm not going to allow anyone to question him

05:32

1   about any other parts of an arrest warrant that is out for his

2   father.  If you would like to regroup with your client about

3   that -- and we can take it question by question, but I want to

4   know what he knew and when he knew that his father was gone.

5            **MR. LIETZ:**  I can answer that.

6            **THE COURT:**  You're not Jordan Satary.  You didn't

7   come before me and get put under oath and be made a third-party

8   custodian so that his father could be released from jail.  He

9   did, and he is the one that's going to answer me about it.

10           **MR. LIETZ:**  I agree.  His lawyer volunteered him on

11  the spur of the moment, but he knew what he was getting into

12  because the Court was real clear about that.  I understand what

13  the Court is saying.

14           Look, let me backtrack a little bit.  When the

15  agents came out to see him on December 6, to his home at around

16  7:00 a.m. in the morning, and said, "Hey we are looking for

17  your dad.  We don't know where he is," he was very concerned,

18  mainly about his family and everything his dad left behind.

19  Being a relatively young individual -- I'm not making excuses

20  for him, but probably he should have picked up the phone and

21  called the probation office and basically said, "I don't know

22  where my dad is.  I know you guys are looking for him.  I don't

23  know where he is," and I'm sorry.  He wasn't thinking in those

24  terms, Judge, when he learned on December 6.

25           **THE COURT:**  Let's --

05:34

1    MR. LIETZ:  -- that his dad has absconded.  I mean,

2  this young man has had a lot of stuff put on him.  I understand

3  everybody is very upset with his father, and there is nobody

4  more upset than he is.  He is.  I'm sorry, but the government

5  did agree to let the man travel freely throughout the

6  United States.

7    THE COURT:  With notice to the probation officer,

8  which I haven't gotten into whether he has violated that, the

9  defendant.

10    MR. LIETZ:  Right.

11    THE COURT:  I'm going to put this aside for a

12  moment --

13    MR. LIETZ:  Yes, ma'am.

14    THE COURT:  -- because my focus is on Khalid Satary

15  right now, although my focus will be back on Jordan Satary.

16    I understand Mr. Satary's wife is here.

17    MR. LIETZ:  That's his ex-wife.

18    THE COURT:  His ex-wife.  Let me hear from her.  Call

19  her.

20    MR. LIETZ:  That's Jordan's mother.

21    THE COURT:  What does she know?  I want to know where

22  Khalid Satary is.

23    MR. LIETZ:  I don't represent her.

24    THE COURT:  What's your name, ma'am?

25    MS. SATARY:  Dawn Satary.

05:35

1        **THE COURT:**  Come up.

2        **MR. LIETZ:**  Judge, I don't know to the extent what

3   the questions are going to be --

4        **THE COURT:**  You don't represent her.

5        **MR. LIETZ:**  You're right.

6        **THE COURT:**  Come up.

7        **MR. LIETZ:**  I would ask the Court to advise her to

8   the extent that the Court thinks it's appropriate.

9        **THE COURT:**  Ma'am, come up to the witness stand.

10        **MS. SATARY:**  Yes.

11        **THE COURT:**  Let me be clear.  You are not in trouble.

12    You are not in trouble.

13        **MS. SATARY:**  Yes, ma'am.

14        **THE COURT:**  Nobody is looking to charge you with

15   anything.  You are not in trouble.  We are looking for -- is it

16   your ex-husband?

17        **MS. SATARY:**  Yes.

18        **THE COURT:**  I want to find out what you know about

19   his whereabouts.  Does that give you some comfort?

20        **MS. SATARY:**  Yes.

21        **THE COURT:**  Come over here, ma'am.

22                          **DAWN SATARY,**

23   having been duly sworn, testified as follows:

24        **THE DEPUTY CLERK:**  Please be seated and then state

25   and spell your name for the record, please.

DAWN SATARY - DIRECT

05:36

1        **THE WITNESS:**  My name is Dawn Satary.

2                    **DIRECT EXAMINATION**

3   **BY THE COURT:**

4   **Q.**   Ms. Satary, you are the ex-wife of the defendant,

5   Khalid Satary.

6   **A.**   Yes, ma'am.

7   **Q.**   When is the last time you were in communication with him?

8   **A.**   I have not been in communication with him.

9   **Q.**   Speak into the microphone because the court reporter --

10              **MR. LIETZ:**  I can't hear anything.

11              **THE COURT:**  Right.  Just speak into that.

12  **BY THE COURT:**

13  **Q.**   When is the last time you were in communication with your

14  ex-husband, Khalid Satary, who is the defendant?

15  **A.**   I have not been in communication with him.

16  **Q.**   Ever?  What does that mean?  When was the last time you

17  were in communication with your ex-husband?

18  **A.**   I saw him only one time at an office and that's it.  I

19  don't recall when the date was.  Maybe in May of 2022.

20  **Q.**   We are in 2022, so May --

21  **A.**   Yes, May.

22  **Q.**   -- of this year about --

23  **A.**   May.

24  **Q.**   -- is the last time you saw him?

25  **A.**   Yes.

DAWN SATARY - DIRECT

05:37

1  **Q.**   Have you had any communication with him -- texts, phone,
2  email -- any other communication from him since that time?
3  **A.**   No, ma'am.
4  **Q.**   Where do you live?
5  **A.**   I live with Jordan Satary.
6  **Q.**   What's the address?
7  **A.**   15755 Tanya Circle, Houston, Texas.
8  **Q.**   Where does Khalid Satary live?
9  **A.**   In Houston, Texas.
10  **Q.**   How far away from where you live with Jordan?
11  **A.**   Maybe 10 miles or 15 miles.
12  **Q.**   How often did Jordan Satary see Khalid Satary?
13  **A.**   I don't know.  I was not present when he would see him.  I
14  don't know when.
15         **MR. LIETZ:**   Judge, I'm sorry.  I just can't hear back
16  here.
17         **THE COURT:**   You have to speak up, ma'am.
18         **THE WITNESS:**   Sorry.  I don't know how often he would
19  see him.  Being that I'm not in the same household, I don't
20  know when.
21  **BY THE COURT:**
22  **Q.**   Do you know where Khalid Satary is now?
23  **A.**   No, ma'am, I do not.
24  **Q.**   Do you know what city or state he is in?
25  **A.**   No, ma'am, I do not.

DAWN SATARY - DIRECT

05:38

1   **Q.**  Has anyone attempted to contact you on his behalf?

2   **A.**  No, never.

3   **Q.**  Do you have any relationship with his current wife?

4   **A.**  I know her.

5   **Q.**  When is the last time you spoke with her?

6   **A.**  Maybe two weeks ago.

7   **Q.**  What was the purpose of that conversation?

8   **A.**  I was dropping off some school supplies for her child, and

9   just the discussion was about the event that she had attended

10   and I did not attend that event.

11   **Q.**  What event?

12   **A.**  It was a concert held in Houston and it was about the --

13   just general conversation about her attendance at that event.

14   That was it.

15   **Q.**  Was Khalid Satary, to your knowledge, in the home when you

16   were talking with his wife?

17   **A.**  No.  No.

18   **Q.**  How do you know that?

19   **A.**  I mean, I did not physically see him in the home.

20   **Q.**  Did you rent the rental car with your son, Jordan Satary?

21   **A.**  No, I did not.

22   **Q.**  When did he rent that?

23   **A.**  A few days after he had his accident, his car accident.

24   **Q.**  Does he still have the rental car?

25   **A.**  To my knowledge, yes, but it's not in his possession.

DAWN SATARY - DIRECT

05:41

1  Q.  What happened to the rental car?

2  A.  I don't know.

3  Q.  When is the last time you saw the rental car?

4  A.  I don't know the date.

5  Q.  So what is --

6  A.  I only saw it the first day that he obtained it.

7  Q.  Jordan lives with you?

8  A.  Yes.

9  Q.  So what's he driving if he got a rental car and is not

10  driving that?

11  A.  He is driving a Mercedes.

12  Q.  Whose Mercedes?

13  A.  I don't know whose it is.  I mean, it's -- I don't know

14  whose it is.  I mean, his father was using that vehicle before.

15  Q.  I'm sorry, his father was using what vehicle?

16  A.  The Mercedes vehicle.  He was using the Mercedes, but

17  Jordan had the Mercedes because we had an event and he needed

18  to be able to transport the artist to and from the airport.  So

19  he was using that vehicle to be able to pick up and take off

20  and deliver the people for the event that we had.

21  Q.  Why wouldn't the rental car have done that?

22  A.  Because it's just a status having the Mercedes and picking

23  up these high-end artists in a nice car, you could say.

24  Q.  When was that?  How long ago?

25  A.  December 2 and 3.

DAWN SATARY - DIRECT

05:43

1  **Q.**   Is that when he got the Mercedes from his father?

2  **A.**   Yes.

3  **Q.**   Do you know what day?

4  **A.**   No, I don't.

5  **Q.**   It was either December 2 or 3?

6  **A.**   Yeah.  I can't remember which day the people were arriving

7  exactly.

8  **Q.**   What was the event?

9  **A.**   A concert.  Arabic singer.

10  **Q.**   Concert for what function?  Was it a fundraiser?  What was

11  it?

12  **A.**   No, it was just a concert.  Jordan promotes concerts for

13  Arabic singers, so it was for that event.

14  **Q.**   Do you know how the exchange of the cars occurred on

15  December 2 or 3?

16  **A.**   No, I do not.

17  **Q.**   When did you learn that Khalid Satary was missing?

18  **A.**   On the day of them arriving in our home in the morning.

19  **Q.**   That was the first you knew that he was missing?

20  **A.**   Yes, ma'am.

21  **Q.**   Did Jordan tell you when he learned he was missing, when

22  he learned that Khalid Satary was missing?

23  **A.**   No.  I believe it was the same day, in fact.

24  **Q.**   Was he still driving the defendant Khalid Satary's

25  Mercedes at that time?

DAWN SATARY - CROSS

05:45

1   A.   Yes.

2   Q.   Do you know if he ever tried to get his rental car back?

3   A.   I don't know about that.

4   Q.   Do you have a decent relationship with Khalid Satary?

5   A.   No, not at all.

6            THE COURT:  Does anybody have any questions for --

7                I'm sorry, was your last name Satary?

8            THE WITNESS:  Dawn Satary.

9            THE COURT:  Dawn Satary.

10               Mr. Woodard, do you have questions for

11  Ms. Satary?

12           MR. WOODARD:  Yes.  Thank you, Your Honor.

13                     CROSS-EXAMINATION

14  BY MR. WOODARD:

15  Q.   Ms. Satary, I believe you mentioned you saw Khalid in

16  May 2022.  Is that right?

17  A.   Yes.

18  Q.   In an office building?

19  A.   Yes.

20  Q.   What city and state?  Was that in Houston?

21  A.   Houston, Texas.

22  Q.   What kind of office building was that, if you remember?

23  A.   Just an office.

24  Q.   Like what kind of business was it, if you could tell?

25           MR. GRUBMAN:  Judge, could I chime in here?

DAWN SATARY - CROSS

05:46

1   Ms. Satary is not my client.  I have never met the woman.  I
2   can't imagine that Mr. Woodard's question has anything to do
3   with where Mr. Satary is now.  It sounds more like it's
4   probably more likely related to what they have under
5   investigation, which the Court said she would not allow him to
6   get into.  So I would object to all these questions and ask
7   that Mr. Woodard be instructed to move on to relevant
8   questions.
9              THE COURT:  All right.  Mr. Woodard, I have advised
10  Ms. Satary that she is not in trouble and, as far as I know,
11  she is not under investigation.  If she is, then she does need
12  to be advised that she has a right to have an attorney.  So if
13  you have any information about that, please advise me because I
14  will advise her of that.
15              Second to that, I do want the focus to be
16  exactly what I said, if she has any knowledge about the
17  whereabouts of her ex-husband, Khalid Satary.
18              MR. WOODARD:  Completely understood, Your Honor.
19  Mr. Khalid Satary is known to have numerous different
20  businesses, and I was trying to understand what this business
21  might be and who he may have been associating with for leads,
22  but I will move on, Your Honor.
23  BY MR. WOODARD:
24  Q.   Ma'am, you mentioned you live with Jordan, right?
25  A.   Yes.

DAWN SATARY - CROSS

05:47

1   **Q.**   How frequently would Jordan talk to his dad,

2   Khalid Satary?

3   **A.**   I mean, I don't know that because, I mean -- I don't hold

4   his telephone in my hand, so I do not know.

5   **Q.**   Would you hear him talking to Khalid Satary from time to

6   time?

7   **A.**   Time to time, yes, but I don't listen to the content of

8   their discussion.

9   **Q.**   Do you know how often Jordan would go to visit

10  Khalid Satary at his home?

11  **A.**   I don't know.

12  **Q.**   Did you ever talk to Khalid Satary about where he might go

13  if he were to go abroad?

14  **A.**   No, absolutely not.

15  **Q.**   Who is paying for the rental car?

16  **A.**   Jordan.

17  **Q.**   Jordan Satary?

18  **A.**   Yes.

19  **Q.**   Is that rental car still outstanding today?  It's still

20  being rented?

21  **A.**   I don't know.

22  **Q.**   Is it a Mercedes-Maybach that is Khalid Satary's car?

23  **A.**   I don't know who is the owner of the vehicle, but he was

24  using that vehicle at one point in time.

25  **Q.**   Okay.  Is that the same car that was at your house

DAWN SATARY - CROSS

05:48

1   recently?

2   **A.**   Yes.

3   **Q.**   Do you know what Jordan did with the rental car around

4   that time?

5   **A.**   I do not know.

6          **MR. WOODARD:**  No further questions.

7                May I have just a moment, Your Honor?  I'm

8   sorry.

9   **BY MR. WOODARD:**

10  **Q.**   Ma'am, do you know if Jordan Satary has one phone or more

11  than one cell phone?

12  **A.**   Only one to my knowledge.

13         **MR. WOODARD:**  Okay.  Thank you, ma'am.

14         **THE COURT:**  Mr. Grubman or Ms. Clark-Palmer, do

15  either of you have any questions?  It's your case.

16         **MR. GRUBMAN:**  No, Your Honor.

17         **MR. LIETZ:**  Could I ask a few, Judge?

18         **THE COURT:**  Mr. Lietz.

19         **MR. LIETZ:**  Thank you, Judge.  I will be brief.

20                       **CROSS-EXAMINATION**

21  **BY MR. LIETZ:**

22  **Q.**   Just a couple of questions, ma'am.  Are you aware of the

23  fact that at some point Jordan got into a wreck in the

24  automobile that he was driving at the time?

25  **A.**   Yes, I am.

DAWN SATARY - CROSS

05:49

1   **Q.**   How did you become aware of that?

2   **A.**   He telephoned me on the day of the accident, and I was on

3   the scene.

4   **Q.**   On the scene after he telephoned you?

5   **A.**   Yes.

6   **Q.**   Why did you go to the scene?

7   **A.**   It's my son and he was in a pretty bad accident.

8   **Q.**   Do you recall when this occurred, roughly?

9   **A.**   The same day that Jordan said.  I can't remember the exact

10   date of it, the accident.  It was raining on a weekend, on a

11   Friday night.

12   **Q.**   Was he able to drive his vehicle away from that scene of

13   that accident?

14   **A.**   No.

15   **Q.**   By the way, do you remember the month that this occurred?

16   **A.**   November.

17   **Q.**   Before or after Thanksgiving?

18   **A.**   Before.

19   **Q.**   So as a result of getting a call from him, I understand

20   you to say you went to pick him up because his car needed to be

21   towed.  Is that correct?

22   **A.**   Correct.

23   **Q.**   How soon after that did he get a car from a rental

24   company, if you recall?

25   **A.**   I think it was about three or four days after the

DAWN SATARY - CROSS

05:50

1   accident.

2   **Q.**   Okay.

3   **A.**   I think.

4   **Q.**   How long did he drive that car, from a few days after the

5   accident till roughly when, ma'am?

6   **A.**   I mean, it was in his possession.  He was driving it

7   regularly.

8   **Q.**   You talked about -- because the judge asked you some

9   questions about this -- an event that I believe you said

10  occurred on December 3.  Do you recall that?

11  **A.**   Yes.

12  **Q.**   Can you tell us a little bit more about that event.

13  **A.**   It's just a concert.  It's an Arabic singer.  She came

14  into town.  She has her group with her.  It's just a

15  performance, a live performance, a live concert.

16  **Q.**   Who was promoting this concert?

17  **A.**   Jordan Satary.

18  **Q.**   Jordan?  What's the name of the artist?

19  **A.**   Nawal El Zoghbi.

20  **Q.**   You said something about this person's status.

21  **A.**   She is a famous Arabic singer.

22  **Q.**   Famous where?

23  **A.**   In Lebanon.

24  **Q.**   Does she have a band that she travels with?

25  **A.**   Yes.

DAWN SATARY - CROSS

05:51

1   **Q.**   Where was this event to take place on December 3?

2   **A.**   In Houston, Texas.

3   **Q.**   I think you talked about Jordan getting a Mercedes,

4   swapping out a Mercedes for the rental car.  Do you recall

5   talking about that?

6   **A.**   Yes.  Yes.

7   **Q.**   Can you tell us a little bit more about the purpose of

8   that.  Why did he do that, if you know?

9   **A.**   Just to go and pick up these people from the airport and

10  transport them to the event -- to the hotel, to the event, and

11  back again to the airport.

12  **Q.**   Okay.

13  **A.**   And while they're in town.  I think they were in town

14  maybe two or three days.

15  **Q.**   Two or three days?

16  **A.**   I believe so.

17  **Q.**   Was Jordan the one that was sort of responsible for

18  showing them around while they were there?

19  **A.**   Yes.

20  **Q.**   I believe you said that Jordan learned about Khalid

21  absconding, you believe, because the agents came to the house?

22  **A.**   Correct.

23  **Q.**   Did you hear any of those conversations?

24  **A.**   I was in the house when they arrived.

25          **MR. LIETZ:**  I don't have any more questions.  Thank

DAWN SATARY - REDIRECT

05:53

1    you, Your Honor.

2                    Thank you, ma'am.

3              THE WITNESS:  Sure.

4                    REDIRECT EXAMINATION

5    BY THE COURT:

6    Q.    Ms. Satary --

7    A.    Yes, ma'am.

8    Q.    -- did Jordan ever go to the hospital?

9    A.    Yes.  We went to the emergency room.

10   Q.    The day of the accident?

11   A.    Yes.

12   Q.    Did he stay in the hospital?

13   A.    No.  He went to the ER and was released.

14   Q.    Did he ever go back into the hospital?

15   A.    No, but he has been seeing a chiropractor two or three

16   times a week, I believe, since the accident.

17   Q.    You heard the testimony today from the probation officer

18   saying that Khalid said he couldn't come to the probation

19   office in Houston because Jordan was in the hospital.  As far

20   as you know that was just a lie?

21   A.    Yes, but he was in the hospital on the day of the -- well,

22   it's not a hospital.  I mean, it's an ER, emergency room.  He

23   did go for evaluation, but was released that day.

24   Q.    That accident was in November?

25   A.    Yes, ma'am.

DAWN SATARY - REDIRECT

05:54

1  **Q.**   Because we are talking about December 1 is when he was due

2  at probation.

3  **A.**   Oh, okay.

4         **THE COURT:**  Ms. Satary, thank you for testifying.

5         **THE WITNESS:**  Yes, ma'am.  Thank you.

6         **THE COURT:**  Now the question is:  Will your client

7  testify to what he knows about his father's whereabouts?

8         **MR. LIETZ:**  I think he wants to cooperate, but I

9  don't think I would advise him to testify because I don't think

10 you can say to him the same thing that you said to Ms. Satary,

11 which is that the information that he provides can't be used

12 against him.  You didn't say that directly to her, but that was

13 basically what you said to her, Your Honor, and I'm sure she

14 appreciated that.  I don't think the Court can say the same

15 thing to him.

16         If the Court can say the same thing, then

17 certainly I would talk to him.  I probably would advise him to

18 testify if the Court can say that his answers will not be held

19 against him; but if they are going to be held against him, I

20 would advise him not to testify.

21         I would also say that to the extent the

22 government has questions -- I mean, don't hear me saying, hey,

23 we won't try to help find the dad, we won't answer additional

24 questions at a later date.  But to the extent his answers today

25 are going to be held against him, I would honestly just have to

05:55   1   advise him, as his lawyer, not to answer those questions.

2              THE COURT:  Mr. Lietz, what is the last text message

3   on any phone that Jordan received from his father?

4              MR. LIETZ:  I think that the agents -- the agent

5   would be able to answer that because they looked at the text

6   messages.  I don't know the answer to that, Judge.  I'm not

7   sure.

8              THE COURT:  Can you consult with your client.  Will

9   he be willing to answer that?

10              MR. LIETZ:  Well, as long as his answer won't be held

11   against him.  I'm concerned that --

12              THE COURT:  Well, first of all, you're going to be

13   saying it and not him.  If you are saying he is willing to

14   cooperate -- I'm asking questions solely related to the

15   whereabouts of Khalid Satary.  Is he willing to answer that

16   through you?

17              MR. LIETZ:  Is it safe to assume that the answer to

18   that will not be held against him?

19              THE COURT:  I'm not in a position to say that.  I'm

20   asking the question:  Are you willing to ask your client to

21   tell you when is the last text message on any phone device he

22   received from his father, period?

23              MR. LIETZ:  Based on what the Court just said

24   recently, the last statement you made about not being able to

25   give us that assurance, at this particular time, respectfully,

05:57

1    no, Your Honor.

2            THE COURT:  So when you stood before me and said he

3    is willing to cooperate -- I just asked a very narrow question

4    directed at the whereabouts of Khalid Satary, and you're

5    advising me that he will not provide that information?

6            MR. LIETZ:  Judge, he did share that information with

7    the government.  The agents talked to him about that.  The

8    reports they have given me say that he showed them those text

9    messages.  When I say that he is willing to cooperate, I think

10   I would be not doing a good job for him if I let him cooperate

11   and his answers could be held against him.

12            I understand why everybody wants to know this

13   information and wants to know where his dad is.  He wants to

14   know that as well.

15            THE COURT:  Is there anything else from the

16   government?

17            MR. WOODARD:  We just maintain that the Court has the

18   authority to order these questions be answered.  We would also

19   note, given the representations of cooperation, we have a

20   consent form that the agents could execute today with Jordan to

21   turn over his phone to be imaged by the government to answer

22   the Court's questions if Mr. Jordan Satary would so consent.

23            THE COURT:  Would he be willing to turn over his

24   phone for a government inspection?

25            MR. LIETZ:  I will certainly talk with him about

05:59

1    that, I will review that consent form and I will advise him on

2    that.  I'm not in a position to answer that, as we sit here in

3    court, without seeing the form and without having additional

4    conversations with the government.

5                    Judge, if there's anything I said that upset

6    you, I'm sorry.

7              THE COURT:  Mr. Woodard, this hearing is done.  This

8    is not the last hearing because I did not notice a contempt

9    hearing, but now I believe that will be the next step.  You

10   will get notice.

11             MR. LIETZ:  Well, I wish the Court would give me an

12   opportunity to speak with him and learn more about the

13   situation myself and perhaps --

14             THE COURT:  To speak with who?

15             MR. LIETZ:  Jordan.

16             THE COURT:  You can have all the time you want right

17   now.

18             MR. LIETZ:  I need more than just today.

19             THE COURT:  I'm not having the contempt hearing

20   today.

21             MR. LIETZ:  Oh, I understand that.

22             THE COURT:  That's exactly why I'm saying that.

23             MR. LIETZ:  Yes.

24             THE COURT:  That's why I've tried to be clear.  My

25   focus today was to find Khalid Satary.  The only purpose in

06:00   1    bringing Jordan Satary here was to find Khalid Satary.  Now, he

2    is not willing to do that.  He is not willing to provide any

3    information as to his responsibilities.

4              I put him under oath and made him responsible.

5    So now I am in a position where, because of what you have said,

6    I have no other recourse but to notice a contempt hearing

7    because he is not complying.  You can stand here all you want

8    and say he is willing to cooperate.  I asked you a very narrow

9    question, and he is not willing to cooperate.  More important,

10   from everything I can tell, he didn't fulfill his obligations

11   as third-party custodian.

12         **MR. LIETZ:**  Judge, we got notice of this hearing last

13   Friday.

14         **THE COURT:**  That's why I'm not holding him in

15   contempt.  That's why I'm going to give you plenty of time.

16         **MR. LIETZ:**  Friday afternoon.  Between late Friday

17   afternoon, 4:00 or 5:00 Atlanta time, I have been told that

18   there's a separate investigation.  The government has stood up

19   in court today and said Jordan Satary's name appears on some of

20   the documents.  The government has talked to him two times, and

21   he has cooperated with them and told them everything he knows.

22   Everything.  That is not sufficient.  They still believe that

23   there's something else.

24              To the extent that he can help them find his

25   dad, he is willing to do that, but he is not willing to do it

06:01

1    by answering questions in open court when the answers to those

2    questions could be held against him, either in connection with

3    an underlying fraud which the government is investigating, the

4    disappearance of his father, or a violation of a bond order.

5              The Court has already concluded before

6    hearing -- it sounded like that there's already been a

7    conclusion reached that he violated the order.

8              **THE COURT:**  That was the purpose of the hearing.  All

9    I've got is the testimony from the probation officer that he

10   did not notify them of anything.  He hasn't notified the Court.

11   I have, what brought this to light, counsel for the defendant

12   who said that Jordan Satary advised them that he was aware that

13   Mr. Satary was missing.

14             **MR. LIETZ:**  I'm not sure what counsel for the

15   defendant advised the Court.  Counsel for the defendant --

16             **THE COURT:**  That they communicated with Jordan

17   Satary, who knew his --

18             **MR. LIETZ:**  Well, Mr. Grubman will probably be a

19   witness if we have a contempt hearing because I can tell you

20   this --

21             **MR. GRUBMAN:**  To be clear, Your Honor, if I could --

22             **MR. LIETZ:**  -- Mr. Jordan Satary did not tell

23   Mr. Grubman that he was aware that his father had absconded.

24             **MR. GRUBMAN:**  Correct.

25             **MR. LIETZ:**  He did not say that.

06:03

1    **THE COURT:**  That he was missing.  I didn't say
2    absconded.
3         **MR. LIETZ:**  He did not tell him that he was missing.
4         **MR. GRUBMAN:**  May I say something for the record?
5    This is Scott Grubman.
6         Can y'all hear me, by the way?
7         **THE COURT:**  Yes.  Yes.
8         **MR. GRUBMAN:**  I agree with Mr. Lietz, Your Honor.
9    With all due respect, the only time that Mr. Jordan said he
10   knew that his dad was missing is after the FBI knocked on the
11   door.  I don't represent Jordan Satary, but I do feel compelled
12   to say that my argument would be who was he to tell.
13        If he only found out when the FBI knocked on the
14   door and the probation office and all them, as agents of the
15   Court executing an arrest warrant, then to argue that he would
16   then have the responsibility to turn around and reinform the
17   Court, whose agents informed him, with all due respect,
18   Your Honor, I think that would be nonsensical.
19        Mr. Jordan Satary did not tell me that he knew
20   where his dad was or that he knew his dad was missing until the
21   FBI, as agents of the Court, and other law enforcement, as
22   agents of the Court executing a search warrant, knocked on
23   Mr. Jordan Satary's door.  So I just want to make that clear.
24        I would be happy to come testify, but that would
25   be my testimony at the hearing.

06:04

1      **THE COURT:**  Just to be clear, I never said and I

2   wasn't saying that he said he knew he was missing at any time

3   beforehand.  I'm saying the exact same thing.  Mr. Grubman

4   advised the Court that he spoke with Jordan Satary, and Jordan

5   Satary had told him that his father was missing.  I'm saying

6   the same thing.  I'm saying he did not advise the Court of

7   that.

8      **MR. LIETZ:**  The thing about it is, Judge, normally

9   when the government makes an allegation, they come into court

10  and they present evidence.  The only evidence that the Court

11  has here today is that Jordan Satary learned about his father

12  being missing on December 6.  That's the only evidence.  That's

13  it right now; that when the agents came out to him, he learned

14  that his dad was gone.

15      I said to you earlier that perhaps he should

16  have picked up the phone and called the probation office or

17  somebody.  I think Mr. Grubman's point is well-taken.  In

18  hindsight, maybe he should have done that, but the only

19  evidence before this Court is that he did not learn of that

20  until December 6.

21      We now know the reason that he rented a car.  We

22  now know the reason he was driving a Mercedes.  If he was going

23  to help his dad abscond, I can't imagine that he would rent a

24  car in his own name and give his dad that car to drive and

25  abscond in.

06:06

1           THE COURT:  The hearing is concluding.

2                 Mr. Grubman and Ms. Clark-Palmer, you have

3     requested from this Court several times, because of

4     Ms. Clark-Palmer's conflict, that the trial date be continued,

5     which obviously was all part of last week.  This case will now

6     be put in fugitive status.  Any assurance or any request that I

7     made to you to hold any date open, such as January 30, which

8     Ms. Clark-Palmer respectfully objected or asked that I

9     reconsider, I am reconsidering now.  There are no trial dates.

10    He is a fugitive.  When he is arrested then, then we will

11    regroup on that.  Is that clear?

12          MR. GRUBMAN:  Yes, Your Honor.  Thank you.

13          THE COURT:  You're welcome.

14                 Anything further from the government?

15          MR. WOODARD:  Just a question, Your Honor, if the

16    Court is setting a follow-up hearing.

17          THE COURT:  I will file something in writing.

18          MR. WOODARD:  Thank you, Your Honor.

19          MR. LIETZ:  May I just clarify?

20          THE COURT:  Yes, sir.

21          MR. LIETZ:  For what purpose?  Contempt?

22          THE COURT:  You'll see it when it comes.

23          MR. LIETZ:  Okay.

24          THE COURT:  If you would like to have any other

25    discussions between counsel and the Court, I am open to them.

06:07

1    Until then, I will issue whatever orders I need to issue for

2    noncompliance.

3        **MR. LIETZ:**  I don't see how he can cooperate with the

4    government with a contempt hearing over his head.

5        **THE COURT:**  Now, Mr. Lietz, it wasn't contempt

6    before, and I haven't issued an order.  Will he cooperate?  You

7    keep going back and forth and anything I say, then you are,

8    like:  Oh, well, now if it's contempt, now he can't cooperate;

9    now if it's this, he can't cooperate.

10               You have just been saying that he is -- throwing

11   out the word "cooperate," and he hasn't given any cooperation.

12   So it's very clear in anything today that he is not willing to

13   cooperate at all to help find his father.

14       **MR. LIETZ:**  Well, what I need to make clear is that I

15   am the one asking him or advising him.  I don't know if the

16   Court would consider giving us some time to talk to the

17   government and perhaps reporting back to the Court in a week

18   maybe.  Maybe we can make some progress with the government.

19   If the Court doesn't want to wait to do that, I certainly

20   understand.  I'm trying to offer that as a possibility for what

21   I think the Court's ultimate interest is.  To the extent

22   that --

23       **THE COURT:**  That was my interest.  I made very clear

24   what my interest was.  My interest was not to punish Jordan

25   Satary.  My interest was very narrowly and seriously focused,

06:09

1   and thus the time crunch from finding out Friday that

2   Mr. Satary was missing to today, to noticing him here to find

3   out if he had any love at all for his family and cared that

4   Jordan Satary was coming in here to find out where Khalid

5   Satary is.

6                   I have this order, and I'm the one who

7   questioned Jordan Satary.  I'm the one who put him as

8   third-party custodian.  He is the one who testified before me

9   in some detail that he would be responsible for this.  Now that

10  he is not cooperating, now I need to take the next step.

11             **MR. LIETZ:**  Well, Judge --

12             **THE COURT:**  I didn't want to do that before.

13             **MR. LIETZ:**  I don't want you to do it either, but

14  part of the reason is, based on the order that you wrote on

15  Friday and then based on things that were said today, it seemed

16  like the conclusion was already reached that he violated your

17  previous order.  I felt like that's what you were

18  communicating.

19             **THE COURT:**  If I was communicating that, then why

20  would I have held a hearing today?

21             **MR. LIETZ:**  Well, I'm only saying that based on that

22  one sentence in the order that -- and I don't have it right in

23  front of me, I'm sorry, but it said something like -- it was a

24  sentence -- I think it was at the very end of a paragraph,

25  maybe the first paragraph, very last sentence.

06:11

1        **THE COURT:**  What it said is, R. Doc. 340 --

2        **MR. LIETZ:**  Yes.

3        **THE COURT:**  -- "It has come to the Court's attention

4 that Jordan Satary may not be in compliance with the terms of

5 his third-party custodian agreement."

6        **MR. LIETZ:**  Right.

7        **THE COURT:**  That is in no way a foregone conclusion

8 because the next sentence sets it for a hearing to determine

9 that.

10       **MR. LIETZ:**  No, I agree exactly with the way that you

11 quoted it.  I thought I heard you saying some things earlier in

12 this hearing that the conclusion was that he has violated it.

13 I mean, again, the only evidence is the evidence we have.  I

14 wish the government would put the -- you know, they could put

15 up the agent as well.

16           Anyway, I'm sorry.  I feel like I'm bothering

17 you at this point, Judge.  If you give us some time to talk to

18 the government, maybe at least several days, maybe there's a

19 path forward short of what maybe you had thought about earlier.

20       **THE COURT:**  I'm not going to stop you from doing

21 that, but I'm telling you you are saying one thing, but you are

22 not doing it.  All you have said is he is willing to cooperate,

23 and he has not been willing to cooperate.  If you want to speak

24 with the government about cooperation and provide some

25 information that will assist them to find Khalid Satary, then I

06:13  1    will see what happens.

2         **MR. LIETZ:**  Based on everything I know, he doesn't

3    have that kind of information.  He does not know where his

4    father is.  He told the agents that.  He has no idea where his

5    father is.

6         Unfortunately, I think the Court is right.  His

7    father -- let's just say that his father is not showing the

8    degree of love and concern and care that a father should show.

9         **THE COURT:**  No.  He throws his son under the bus and

10   perhaps in contempt so that he can walk free.  I don't know

11   what kind of individual does that and puts any child in that

12   position, an adult child or anyone else, but that's what your

13   father has chosen to do.

14        Court is in recess.

15        **MR. LIETZ:**  Thank you, Your Honor.

16        **MR. WOODARD:**  Thank you, Your Honor.

17        **THE DEPUTY CLERK:**  All rise.

18        (Proceedings adjourned.)

19                          * * *

20                     **CERTIFICATE**

21        I, Toni Doyle Tusa, CCR, FCRR, Official Court
     Reporter for the United States District Court, Eastern District
22   of Louisiana, certify that the foregoing is a true and correct
     transcript, to the best of my ability and understanding, from
23   the record of proceedings in the above-entitled matter.

24

25                     */s/ Toni Doyle Tusa*
                       Toni Doyle Tusa, CCR, FCRR
                       Official Court Reporter